UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. CR 07-00604 MMM |
| Plaintiff, | ) ) | |
| vs. | ) ) | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S |
| WILLIAM VANCE TURNER, | ) ) | MOTION TO SUPPRESS |
| Defendant. | ) ) | |
| | ) ) | |
| | ) | |

On May 23, 2008, defendant William Vance Turner filed a motion to suppress oral statements he allegedly made to law enforcement officers on the day of his arrest. Turner asserts that the statements were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966) and *Edwards v. Arizona*, 451 U.S. 477, 485 (1981), and that his waiver of his *Miranda* rights was not knowing and voluntary based on his purported incompetence. The government counters that the statements are admissible because Turner understood his rights and executed a written waiver prior to making the allegedly incriminating statements. On June 9, 2008, the court held an evidentiary hearing regarding the motion at which Federal Bureau of Investigation ("FBI") Special Agents Theresa A. Papuyo and Stephen J. May, and Los Angeles Police Department Detective E. Skip Bauchman, testified. Having considered the evidence adduced at the hearing, the declarations submitted

by Turner, Papuyo, May and Bauchman and the arguments of counsel, the court denies the motion to suppress.

## I.  FACTUAL BACKGROUND

### A.  Turner's Arrest and Initial Interrogation

On the morning of June 13, 2007, FBI Special Agents Theresa A. Papuyo and Stephen J. May established surveillance of Turner's residence.[1]  Papuyo and May observed Turner exit the residence and enter a waiting vehicle.[2]  The agents followed the vehicle for a short distance and then arrested Turner at approximately 9:01 a.m.[3]  They transported Turner to the FBI office in Los Angeles, California, and arrived at approximately 9:25 a.m.[4]  The agents did not question Turner during the drive.[5]

At approximately 10:50 a.m., Papuyo and Detective Skip Bauchman of the Los Angeles Police Department met with Turner.[6]  Before asking Turner any questions, Papuyo introduced herself and Bauchman and explained the purpose of the interview.[7]  Papuyo provided Turner with an "Advice of Rights" form and also verbally informed him of his rights.[8]  Turner indicated that he had read the "Advice of Rights" form and understood his rights; he signed the "Advice of Rights Form" at

---

[1]Declaration of Theresa A. Papuyo ("Papuyo Decl."), ¶ 2.

[2]*Id.*

[3]*Id.*

[4]*Id.*

[5]*Id.*

[6]*Id.*, ¶ 3.  Bauchman participated in the interview because the LAPD was conducting an investigation of certain bank robberies that were committed in the City of Los Angeles.  (*Id.*)

[7]*Id.*, ¶ 4.

[8]*Id.*; Declaration of E. Skip Bauchman ("Bauchman Decl."), ¶ 3.

approximately 11:02 a.m.[9]  Bauchman and Papuyo signed the form as witnesses.[10]

After Turner signed the *Miranda* waiver, the agents interrogated him until approximately 12:36 p.m.[11]  At numerous times during this initial hour and a half interrogation, Turner interrupted the questioning and asked to use the telephone.[12]  Papuyo testified that Turner "went back and forth" about getting a lawyer during this period.[13]  He placed calls to his mother, sister and wife, asking each one to help him contact a specific lawyer.[14]  The evidence does not establish the exact number of calls he made. During one call with his sister, Cheryl Turner, Turner told her that he needed to talk to his wife so that he could contact her attorney, and said: "[T]hey ha[ve] pictures, they say I did the robberies."[15]

The agents resumed questioning immediately after each unsuccessful attempt Turner made to contact the attorney.[16]  On each occasion, as questioning resumed, Turner said that he was willing to continue talking with the agents.[17]

Turner also made numerous requests during the interrogation.  Papuyo gave Turner water and snacks at his request.[18]  He repeatedly asked for cigarettes,[19] which Papuyo gave him.  She also interrupted the interview so that Turner could go outside the building to smoke.[20]  Papuyo also allowed

---

[9]Papuyo Decl., ¶ 4, Exh. 1.

[10]*Id.*

[11]Id., para 11.

[12]Transcript at 53:25-54:23.

[13]Transcript at 49:13-16.

[14]Papuyo Decl., ¶ 9.

[15]Papuyo Decl., Exh. 2.

[16]Transcript at 53:24-55:21; see discussion, *supra* at 19-21.

[17]*Id.* at 55;18-21.

[18]Papuyo Decl., ¶ 7; Bauchman Decl., ¶¶ 12-13.

[19]Papuyo Decl., ¶ 7; Bauchman Decl., ¶ 11.

[20]*Id.*

him to use the restroom when he asked to do so.[21]

**B.    The Government's Classification of Statements Made During Turner's Initial Interrogation**

The government has divided the statements Turner made during this initial hour and a half interrogation into two sets.[22]  It uses one of the telephone calls placed by Turner as the dividing line between what it characterizes as the "first set" and "second set" of statements.[23]  This call, to Turner's wife, Chanette Fleming, occurred approximately half way into the hour and a half session.[24]  After speaking with Fleming, Turner told agents that Fleming did not want him to talk with them until she contacted her attorney.[25]  He said, however, that he was willing to continue speaking with them.[26]

It is unclear at what point during the initial hour and a half interrogation Turner allegedly made the statements categorized by the government as the first and second sets; the only information the government provides in this regard is the agents' testimony that the first set of statements occurred "early" in the questioning,[27] before one of Turner's calls to Fleming, while the second set occurred after the call.[28]  As discussed in more detail below, the government's attempt to segregate the statements into groups is not particularly useful in determining whether the statements were violated *Miranda*.  For ease of discussion, however, the court employs the government's classification below.

---

[21]Papuyo Decl., ¶ 7.

[22]Government's Opposition to Derendant's Motion to Suppress ("Opp.") at 4-5.

[23]*Id.*

[24]Papuyo Decl., ¶ 11; Bauchman Decl., ¶ 5.

[25]Papuyo Decl., ¶ 11; Bauchman Decl., ¶ 8.

[26]Papuyo Decl., ¶ 11; Bauchman Decl., ¶¶ 7-8.

[27]Bauchman Decl., ¶ 4.

[28]Papuyo Decl., ¶ 11; Bauchman Decl., ¶ 8.

### 1.    First Set of Statements

Early in the interview, Turner said something to the effect of, "I know how you guys got me."[29] He then said that a specific woman had called and told authorities where he was.[30]  Turner also stated that he had married Chanette Fleming about six months prior to his arrest.[31]  He said that she was a publicist and did "not know anything" about how he earned a living.[32]  Turner explained that he had told Fleming he was "a hustler."[33]

### 2.    Second Set of Statements

Sometime after the call to Fleming used by the government as a dividing line, Turner allegedly made a statement concerning bank robberies.  Papuyo recalls that Turner stated he "did rob banks" but that "he never carrie[d] a gun."[34]  Bauchman remembers that Turner said something like "I may do this but I never carry a gun."[35]

### C.    Termination of First Round of Interrogation and Statements Classified by the Government as the Third Set

Some time after Turner made these statements, at approximately 12:36 p.m., the agents terminated the interview.[36]  Papuyo and Special Agent May began to drive Turner to court so he could make his initial appearance.[37]  While en route, Turner told Papuyo and May that he had changed his

---

[29]Bauchman Decl., ¶ 4.

[30]*Id.*

[31]*Id.*, ¶ 5; Papuyo Decl., Exh. 2.

[32]*Id.*

[33]*Id.*

[34]Papuyo Decl., ¶ 12.

[35]Bauchman Decl., ¶ 9.

[36]At the hearing, the agents suggested that they terminated the interrogation because they were frustrated with Turner's numerous telephone calls and the fact that he went "back and forth" on various issues, including legal counsel.  (Transcript at 35:25-36:16.)

[37]Papuyo Decl., ¶ 13.

mind, having seen the bank surveillance photographs shown to him during the initial interrogation, and wanted to talk with them again.[38]  After confirming that Turner truly wished to re-initiate the interview, Papuyo turned around and drove back to the FBI office.[39]  On the way back, the agents stopped at a fast food restaurant and bought Turner lunch.[40]

Upon their return to the FBI office, at approximately 1:00 p.m., Papuyo and May resumed the interrogation.[41]  At some point, Fleming arrived; the agents took Turner outside to meet her because visitors are not allowed in FBI interview rooms.[42]  Fleming told Turner to get a lawyer, to which he responded, "I saw the pictures."[43]  During this conversation, neither Turner nor Fleming asked to speak privately or asked the agents to stand at a distance so they could not overhear the conversation.[44]

When they returned to the interview room, Turner suggested that he was still willing to talk with the agents, but that his wife would not let him.[45]  Eventually, the agents ended the interview and left the FBI at approximately 3:15 p.m. to drive Turner to his initial appearance.[46]  Either during this trip or perhaps during the earlier drive to the FBI offices following Turner's arrest, Turner asked the agents whether they "would . . . have caught [him]" if he had done certain things differently.[47]  According to May, Turner also said: "If I had gone out the back door instead of the front, would you have gotten

---

[38]*Id.*, ¶ 14.

[39]*Id.*

[40]*Id.*

[41]Papuyo Decl., ¶ 15; May Decl., ¶ 5.

[42]*Id.*

[43]Papuyo Decl., ¶ 15; May Decl., ¶ 6.

[44]Papuyo Decl., ¶ 15.

[45]*Id.*, ¶ 16; May Decl., ¶ 5.

[46]Papuyo Decl., ¶¶ 16-17.

[47]May does not recall if these statements were made on the ride to the FBI office just after Turner's arrest or on the drive to his initial appearance. (Declaration of Stephen J. May ("May Decl."), ¶ 7).  May also does not recall exactly what Turner said.  (*Id.*)

6

me?"[48]  The government classifies these comments as Turner's "third set" of statements.[49]  While the statements may have been made during the drive to the initial appearance, and been a "third set" of statements, they may also have occurred before the "first set" of statements the government identifies.

### D.      Fourth Set of Statements

The government classifies Turner's statements during the second round of interrogation after his return to the FBI's office and his statements to Fleming there as his "fourth set" of statements.[50]

### E.      Turner's Competency

Papuyo and May report that Turner was lucid and coherent at all times during his conversations with them.[51]  Turner did not lose focus or sit silently during the interviews.[52]  He also did not claim that he was hearing voices or do anything unusual.[53]  He did not exhibit any signs of confusion or an inability to understand what was happening.[54]  Turner was able to carry on conversations with the agents and responded intelligibly to their questions.[55]  He exhibited no signs or odor of intoxication or drug use.[56]

## II.  DISCUSSION

### A.      Legal Standard Governing Suppression Of Statements Under *Miranda v. Arizona*

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that, because of the

---

[48]*Id.*

[49]Opp. at 5-6.

[50]Opp. at 6-7.

[51]*Id.*, ¶ 18; May Decl., ¶¶ 14-15.

[52]Bauchman Decl., ¶ 15.

[53]*Id.*

[54]*Id.*, ¶¶ 14-15; Papuyo Decl., ¶ 18.

[55]*Id.*

[56]*Id.*

1  inherently coercive nature of custodial interrogation, a person must be advised of his or her

2  constitutional rights – including the right to an attorney and the right to remain silent – prior to

3  questioning.  *Id.* at 444; see *United States v. Butler*, 249 F.3d 1094, 1098 (9th Cir. 2001).  The

4  government can introduce an incriminating statement made by the defendant during custodial

5  interrogation only if it demonstrates that the defendant voluntarily, knowingly, and intelligently waived

6  his or her *Miranda* rights.  *Miranda*, 384 U.S. at 475.[57]

7  **B.    Whether Turner's Waiver of his *Miranda* Rights Was Knowing and Voluntary**

8  Even if *Miranda* warnings are given, a defendant's statements to law enforcement can be

9  admitted only if they were voluntarily made.  See *United States v. Tingle*, 658 F.2d 1332, 1334 (9th Cir.

10  1981) ("[I]nvoluntary confessions are forbidden because of the 'strongly felt attitude of our society that

11  important human values are sacrificed where an agency of the government, in the course of securing a

12  conviction, wrings a confession out of an accused against his will,'" quoting *Blackburn v. Alabama*, 361

13  U.S. 199, 206-207 (1960)).

14  The government has the burden of proving, by a preponderance of the evidence, that the

15  defendant acted voluntarily in making incriminating statements.  See *Lego v. Twomey*, 404 U.S. 477,

16  489 (1972); *Tingle*, 658 F.2d at 1335.  "An inculpatory statement is voluntary only when it is the

17  product of a rational intellect and a free will." *United States v. Leon Guerrero*, 847 F.2d 1363, 1365-

18  66 (9th Cir. 1988) (citing *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960); *United States v. Crespo*

19  *de Llano*, 830 F.2d 1532, 1541-42 (9th Cir. 1987)).  "The test is whether, considering the totality of

20  _____

21  [57]Before *Miranda* protections are triggered, however, an individual must be subjected to an
22  "interrogation" while "in custody."  *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002) ("An
   officer's obligation to give a suspect *Miranda* warnings before interrogation extends only to those
23  instances where the individual is 'in custody,'" citing *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)
   (per curiam)); see *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980) ("We conclude that the *Miranda*
24  safeguards come into play whenever a person in custody is subjected to either express questioning or
   its functional equivalent"); *Mathiason*, 429 U.S. at 495 ("*Miranda* warnings are required only where
25  there has been such a restriction on a person's freedom as to render him 'in custody.'  It was that sort
   of coercive environment to which *Miranda* by its terms was made applicable, and to which it is
26  limited"); *Butler*, 249 F.3d at 1098 ("[N]ot all questioning by law enforcement officers triggers the
27  warning requirement.  The sine qua non of *Miranda* is custody").
   Here, the government concedes that Turner's interviews were custodial in nature and therefore
28  governed by *Miranda*, as he had been arrested on the morning of June 13, 2007.  (Pl.'s Mot. at 8).

the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *Id.* at 1366 (citing *Haynes v. Washington*, 373 U.S. 503, 513-14 (1963); *United States v. Pinion*, 800 F.2d 976, 980 (9th Cir. 1986); and *Tingle*, 658 F.2d at 1335); see also *Berryman v. Ayers*, CV 95-05309 AWI, 2007 WL 1991049, *45 (E.D. Cal. July 10, 2007) (" In *Moran v. Burdine*, the Court sets out the two parts to a valid *Miranda* waiver: 'First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived,'" quoting *Moran v. Burdine*, 475 U.S. 412, 421 (1986)).

### 1.    Whether the Agents Coerced Turner

As noted, subsequent to Turner's arrest, but before asking him any questions, Agent Papuyo introduced herself and Detective Bauchman and explained the purpose of the interview.[58]  Papuyo gave Turner an "Advice of Rights" form and also verbally informed him of his *Miranda* rights.[59]  Turner indicated that he had read the "Advice of Rights" form and understood his rights; he then

---

[58]Papuyo Decl., ¶ 4.

[59]*Id.*; Bauchman Decl., ¶ 3.

9

signed the form.[60]  Bauchman and Papuyo signed the form as witnesses.[61]

Turner does not argue that his statements were the product of physical or psychological coercion and it does not appear to the court that the agents used coercion to secure his waiver of *Miranda* rights.  In addition to explaining his rights to Turner both orally and in writing, the agents appear to have used some caution to ensure that their interview of Turner was not coercive.  Agent Papuyo, for instance, granted Turner's requests for water, snacks, and cigarette and restroom breaks, and also bought him lunch.[62]  When Turner's wife arrived at the FBI office, Turner was permitted to speak with her in person outside the interview room.[63]  Additionally, Turner was not interviewed for extended or uninterrupted periods, nor is there any allegation that the agents acted abusively towards him.

### 2.      Whether Turner was Competent to Waive His Rights

Turner appears to argue that he could not knowingly and voluntarily have waived his rights because he was not competent to do so.  He asserts that the waiver of rights "is called into question" because while in federal prison on a prior occasion, he "was beaten and victimized by Federal Prison

---

[60]Papuyo Decl., ¶ 4, Exh. 1.  A copy of the "Advice of Rights" form is attached to the declaration of Agent Papuyo.  It states: "YOUR RIGHTS.  Before we ask you any questions, you must understand your rights.  You have the right remain silent.  Anything you say can be used against you in court.  You have the right to talk to a lawyer for advice before we ask you any questions.  You have the right to have a lawyer with you during the questioning.  If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.  If you decide  to answer questions now without a lawyer present, you have the right to stop answering at any time."  (*Id.*, Exh. 1).  The form then states: "WAIVER OF RIGHTS.  I have read this statement of my rights and I understand what my rights are.  At this time, I am willing to answer questions without a lawyer present."  (*Id.*)  The form was signed by Turner and witnessed by Papuyo and Bauchman.  (*Id.*)

[61]*Id.*

[62]*Id.*, ¶ 7.

[63]*Id.*, ¶ 15.

Guards."[64]  According to Turner, "he has never been the same since."[65]  Turner notes that, to the extent his *Miranda* waiver was not knowing and voluntary, his subsequent statements must be suppressed.[66]

Turner's claim that he "has never been the same" since a beating by prison guards in 1996 does not show that when he waived his *Miranda* rights, he did not fully appreciate both the nature of the rights being given up, and the consequences of his decision to waive them. Cf. *Moran*, 475 U.S. at 421.  While Turner implies that the beating affected his mental functioning, he does not expressly state this, nor give any indication of the manner in which the beating changed him.[67]  Nor is there evidence that Turner's actions during the interview were such that they give rise to an inference that he was not competent to waive his rights, or that the agents should have questioned whether he suffered from a mental disorder that impaired his ability to understand the waiver of rights.

Turner was lucid and coherent at all times during his conversations with Papuyo and May.[68]  He did not lose focus or sit silently during the interview.[69]  Nor did he claim that he was hearing voices or do anything unusual.[70]  He did not exhibit confusion or an inability to understand what was

---

[64]Defendant's Notice of Motion to Suppress Evidence ("Def.'s Mot.") at 5.

[65]*Id.*; Declaration of William Vance Turner ("Turner Decl."), ¶ 1 ("While in Federal Prison in August of 1996, I was beaten and victimized by Federal Prison Guards.  I have not been the same since").

[66]Def.'s Mot. at 5.

[67]The court held its ruling in abeyance to allow Turner to supplement his motion with relevant evidence produced by the government regarding prison guards' abuse of defendant during a prior incarceration and whether this had any effect on defendant's competence.  Although the government produced the additional evidence as directed by the court, defendant did not file supplemental papers supporting the motion to suppress.

[68]*Id.*, ¶ 18; May Decl., ¶¶ 14-15.

[69]Bauchman Decl., ¶ 15.

[70]*Id.*

happening,[71] and was able to converse with the agents and respond intelligibly to their questions.[72] Finally, Turner did not exhibit any signs or odor of intoxication or drug use.[73]

On May 30, 2008, the court issued an order requesting that the Federal Bureau of Prisons conduct an evaluation of Turner to determine his sanity at the time of the offenses with which he is charged.[74]  The conclusion that Turner was competent to waive his rights during the interrogation is confirmed by the forensic psychological analysis conducted in response to this order, completed on July 11, 2008.[75]  The forensic psychologist noted that the symptoms of mental illness reported by Turner were inconsistent with his observed behavior, and that his descriptions of symptoms contradicted each other.[76]  The report stated that it appeared Turner was attempting to fabricate a mental impairment.[77]  Specifically, the evaluator found no objective evidence that Turner suffered from depression, psychosis, severe mental retardation, dementia, or any other type of involuntary interference with his cognitive processing or intellectual functioning at the time of the offense. Additionally, the report found that Turner did not suffer from a major mental disorder that rendered him unable to understand the nature, quality, or wrongfulness of his actions at the time of the offense.[78]

---

[71]*Id.*, ¶¶ 14-15; Papuyo Decl., ¶ 18.

[72]*Id.*  Bauchman reported that Turner conversed in a normal manner about a variety of subjects. (Bauchman Decl., ¶ 14).  He understood and answered questions that were asked of him and was able to carry on a "two way" conversation.  (*Id.*).  Additionally, he was able to recall details from his past. For instance, Turner and Bauchman discussed how they had attended rival high schools and Turner was able to recall his experiences.  (*Id.*).

[73]*Id.*

[74]May 30, 2008 Order for Examination of Defendant's Mental Status to Determine Sanity at the Time of the Offenses.

[75]This report was filed with the court under seal on August 8, 2008.

[76]See Docket Entry No. 85.

[77]*Id.*

[78]*Id.*

A second evaluation of Turner's competency to stand trial, completed on May 21, 2008, similarly confirms the conclusion that he was competent to waive his rights.[79]   The evaluator reported that although Turner expressed concerns regarding his mental health as a result of the abuse he suffered in prison in 1996,[80] he displayed no signs of a formal thought disorder or psychosis,[81] nor evidence of delusions, loose associations, confusion, or confabulations.[82] The evaluator opined that Turner demonstrated an adequate understanding of the nature and consequences of the court proceedings against him, and an adequate ability to cooperate and assist counsel in his defense.[83] She concluded that Turner was competent to stand trial, as there was no objective evidence that he suffered from signs or symptoms of a major mental disorder that impaired his ability to understand the nature and consequences of the court proceedings against him, or properly to assist counsel in his defense.[84]

Based on the agents' contemporaneous observations of Turner's mental state during the interview, the report of the evaluator regarding his competency to stand trial, and Turner's failure to adduce any evidence that he was incompetent at the time of the interview, the court concludes that the government has met its burden of showing that Turner knowingly and voluntarily waived his *Miranda* rights.  Cf. *United States v. Jones*, CR 04-498 PMP GWF, 2007 WL 64435, *5 (D. Nev. Jan. 5, 2007) ("Prior to questioning the Defendant, Detective Flink advised him of his *Miranda* rights.  It appears from the audio recording and the transcript, Government's Exhibits 1 and 2, that Defendant understood and responded to the Detective's questions concerning the gun, how long he possessed it, from whom he obtained it and what use, if any, he made of it during the time it was in his possession. Although Defendant and the Detective also engaged in a rambling and, to some degree, incoherent and

---

[79]This report was filed with the court under seal on June 3, 2008.

[80]See Docket Entry No. 67.

[81]*Id.*

[82]*Id.*

[83]*Id.*

[84]*Id.*

1   confusing discussion regarding his relationship with Ms. Santiago and her family, it appears that

2   Defendant understood and responded intelligently to the Detective's questions regarding the gun when

3   she returned to that subject later in the interview.  The mental health records submitted by the Defendant

4   indicate that he reported hearing voices and was suffering from paranoia.  The records, however, also

5   indicate that the Defendant was oriented to person, place, situation and time, and that his thought

6   process was coherent, but also tangential and vague.  No expert testimony was presented regarding

7   Defendant's mental state at the time of the interview.  Even considering the jail mental health records

8   submitted by the Defendant, the Court finds that they do not support the conclusion that his mental

9   condition was such that his statements to the Detective were not the product of a rational intellect and

10  free will.  The Court finds no evidence that would support a finding that Detective Flink engaged in

11  coercive tactics or other improper tactics in conducting the interview").

12      **C.    Whether Turner's Statements Were Taken in Violation of *Edwards v. Arizona***

13          **1.    Standard Governing Requests for Counsel Under *Edwards***

14          In *Edwards v. Arizona*, 451 U.S. 477 (1981), the Supreme Court held that when a suspect

15  requests counsel at any time during a custodial interrogation, he cannot be subjected to further

16  questioning unless a lawyer has been made available or the suspect reinitiates conversation.  *Id.* at

17  484.  "To invoke the 'prophylactic rule' established in *Edwards*, however, a court must first

18  'determine whether the accused *actually invoked* his right to counsel.'"  *Williams v. Horel*, C

19  07-4269 TEH, 2008 WL 619071, *4 (N.D. Cal. Mar. 5, 2008) (quoting *Smith v. Illinois*, 469 U.S.

20  91, 95 (1984)) (emphasis added in *Williams*).  To invoke his or her right to counsel, "'the suspect

21  must unambiguously request counsel'; that is, he or she 'must articulate his desire to have counsel

22  present sufficiently clearly that a reasonable police officer in the circumstances would understand

23  the statement to be a request for an attorney.'"  *Id.* (quoting *Davis v. United States*, 512 U.S. 452,

24  459 (1994).  "'If the statement fails to meet the requisite level of clarity, *Edwards* does not require

25  that the officers stop questioning the suspect.'"  *Id.* (quoting *Davis*, 512 U.S. at 459).

26          "As the reference to 'a reasonable officer' implies, whether or not the invocation is

27  ambiguous is an objective inquiry."  *Bates v. Clark*, CV 07-330 H BLM, 2008 WL 1787407, *20

28  (S.D. Cal. Apr. 16, 2008) (citing *Davis*, 512 U.S. at 458-59).  "[W]hile the officer is not required to

bring the interrogation to a halt in the face of an ambiguous invocation of the right to counsel, the Supreme Court has admonished that 'when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney' before proceeding." *Id.* (citing *Davis*, 512 U.S. at 461). "The Court [has] declined, however, to require officers to ask clarifying questions." *Id.* (citing *Davis*, 512 U.S. at 461).

If a court finds that an accused unambiguously invoked his *Miranda* rights, the court "may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." *Smith v. Illinois*, 469 U.S. 91, 95 (1984) (citing *Edwards*, 451 U.S., at 485, 486 n. 9). The mere fact that a defendant continues to respond to questions after invoking the right to counsel does not automatically justify a finding that he has waived his right to counsel. *Edwards*, 451 U.S. at 484-85; *United States v. Cheely*, 36 F.3d 1439, 1448 (9th Cir. 1994). Rather, a statement made by a suspect to officers after the suspect's invocation of his right to counsel constitutes an "initiation" of further discussion under *Edwards* when it "evince[s] a willingness and a desire for a generalized discussion about the investigation." *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983) (plurality opinion) (holding that there was no violation of *Edwards* where an officer began questioning after a suspect, who had invoked his right to counsel, asked "Well, what is going to happen to me now?" but noting that "some inquiries, such as a request for a drink of water or a request to use a telephone . . . are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation"); *id.* at 1055 (Marshall, J., dissenting) ("agree[ing] with the plurality that, in order to constitute 'initiation' under Edwards, an accused's inquiry must demonstrate a desire to discuss the subject matter of the criminal investigation," but finding it "plain that [the suspect's] only 'desire' was to find out where the police were going to take him").

Here, Turner made numerous telephone calls in an effort to reach an attorney during the initial interrogation. Bauchman states, for example, that Turner "made several telephone calls to

people, asking them to try to call a specific lawyer" during the course of the interview.[85]   When questioned about this statement at the hearing, Bauchman appeared to believe that Turner's statements during the telephone calls demonstrated that he wanted to speak with an attorney, although his testimony on the point was not entirely clear.[86]   Bauchman also testified that Turner made "a lot" of calls "directed to his wife to get the attorney."[87]   Papuyo testified that during the interview, Turner "went back and forth" about getting an attorney.[88]

### 2.      Whether Turner Unambiguously Invoked His Right To Counsel

Turner argues that the "clear context" of his telephone calls was that he "sought advice from a lawyer before he continued answering questions."[89]   He contends that his request for a lawyer was not honored, "but rather side stepped" by the agents, that no lawyer was summoned and that the interrogation continued.[90]   As a result, Turner contends, his statements were obtained in violation of *Edwards* and must be suppressed.[91]

Generally, when in custody, a suspect's attempt to contact an attorney by telephone, when it occurs in the presence of a law enforcement officer, is an unambiguous invocation of the suspect's right to counsel.   See *Abela v. Martin*, 380 F.3d 915, 926 (6th Cir. 2004) (holding that "a reasonable officer would understand [a suspect's] statement to be a clear request for counsel" where the suspect said that "maybe" he should talk with an attorney, "named the specific individual with whom he wanted to speak[,] . . . showed [the officer] the attorney's business card," and the officer left to dial

---

[85]Bauchman Decl., ¶ 7.

[86]Transcript at 54:15-20:
"Q. And when he made that statement, when Turner made several phone calls to people asking them to try to call a specific lawyer, did you take that to mean that Mr. Turner wanted a lawyer? A.  I took that to mean that he was trying to get in contact with an attorney, yes."

[87]Transcript at 60:24-25.

[88]Transcript at 49:14-16.

[89]Def.'s Mot. at 6.

[90]*Id.*

[91]*Id.*

the number); *United States v. Porter*, 764 F.2d 1, 6 (1st Cir. 1985) (holding that a suspect's "attempt to contact his attorney constituted an exercise of his right to counsel" where the suspect "made two phone calls, one to the operator seeking information and the other to his attorney's office" in the presence of a DEA agent); see also *Robinson v. Borg*, 918 F.2d 1387, 1391 (9th Cir. 1990) ("Robinson's statement 'I have to get me a good lawyer, man. Can I make a phone call?', made in the middle of an interrogation, can only reasonably be understood as expressing a desire to obtain counsel and to do so immediately, not at a trial several months later.  Robinson's request to make a phone call immediately after stating that he had to get a good lawyer was a request to make a call at that moment, and the interrogators so understood it.  The purpose of the call was obvious; Robinson wanted to obtain a lawyer – and he wanted one in connection with the interrogation he was then undergoing. . . .  The only reasonable explanation for Robinson's decision to interrupt the questioning and ask to make the call was that he wanted an attorney in connection with the interrogation"). Cf. *United States v. Martin*,  95 Fed. Appx. 169, 177-78 (6th Cir. Apr. 16, 2004) (Unpub. Disp.) (concluding that a suspect's attempt to call an attorney from his cell phone during his initial detention was not an invocation of his right to counsel where the suspect did not inform the agent present who he was trying to call).

Here, Turner interrupted the interrogation multiple times attempting to contact a lawyer by telephone. As in *Robinson*, this indicated that he wanted to speak with a lawyer "in connection with the interrogation." See *Robinson*, 918 F.2d at 1391.  If Turner had merely wished to talk to a lawyer at some point in the future, he would not have needed to interrupt the interrogation to place a telephone call.[92]  See *id*.  Also, as in *Abela*, Turner specifically identified the lawyer he wanted to contact, further indicating that he had a present desire to speak with a lawyer immediately, rather than to consult a lawyer at some point in the future.  See *Abela*, 380 F.3d at 926 (holding that there

_____

[92]For this reason, Bauchman's statement that "I knew in my mind it was like he was saying that, you know, throughout the course of this interview, I know at some point in time I'll need to talk to a lawyer, but right now I'll talk to you guys," Transcript at 58:21-24, is unpersuasive.  Whether a suspect invoked the right to counsel is an objective inquiry.  See *Abela*, 380 F.3d at 926 (citing *Davis*, 512 U.S. at 459).  If Turner had wanted to talk to a lawyer "at some point in time," he obviously would not have needed to interrupt the interrogation to try to contact counsel as he did.

had been an invocation of the right to counsel where "Abela did not merely say, 'Maybe I should talk to an attorney[.]' . . . Rather, Abela named the specific individual with whom he wanted to speak and then showed Sergeant McCabe the attorney's business card").

Turner's attempts to contact the lawyer were made in the presence of the agents, who knew the specific individual he was trying to contact. To invoke the right to counsel, a suspect "'must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.'" *Williams*, 2008 WL 619071 at*4 (quoting *Davis*, 512 U.S. at 459). Turner did more than "articulate a desire to have counsel present"; he actively sought a lawyer's presence. The court concludes that Turner's decision to interrupt the interview for this purpose was an unambiguous invocation of his right to counsel.[93]

### 3.    Whether Turner Subsequently Reinitiated Discussion of the Investigation

The fact that Turner invoked his right to counsel by trying to contact an attorney on his cell phone in the agents' presence does not end the inquiry. The court must also determine whether Turner subsequently initiated a discussion concerning the investigation and waived the right he had invoked by attempting to contact a lawyer. See *Bradshaw*, 462 U.S. at 1045-46. Soon after at least certain of his attempts to reach the attorney, Turner stated that he was willing to continue talking with the agents. For these statements to be effective as waivers of Turner's right to counsel, the agents' questioning must have ceased between Turner's invocation of his right to counsel (that is, his telephone calls trying to reach the attorney) and his expression of willingness to discuss the

---

[93]As discussed *infra*, Turner also stated numerous times after trying to contact the lawyer that he was willing to proceed with the interview. Any statements made after a suspect attempts to contact counsel cannot be considered in determining whether the suspect's call to the attorney constituted an unambiguous invocation of his right to counsel. See *Robinson*, 918 F.2d at 1391 n. 4 (" The dissent and the State, as well as the magistrate and the state court, err by looking at the 'totality of the circumstances,' particularly the events subsequent to Robinson's request, to determine whether he adequately invoked his right to counsel. The Supreme Court in *Smith v. Illinois* emphasized that an accused's postrequest responses cannot be used to cast doubt on the clarity of the initial request [469 U.S. 91, 100(1984)], and '[t]he totality of the circumstances test, which is used to determine whether an accused has 'knowingly and voluntarily' waived his *Miranda* rights, has no role in the determination of whether an accused's request for counsel is clear or equivocal.' *Owen v. Alabama*, 849 F.2d [536,] 539 [(11th Cir. 1988)] (citation omitted); cf. *Smith v. Illinois*, 469 U.S. at 97-98 [ ]").

investigation.   See *Miranda*, 384 U.S. at 474 (once a suspect has exercised his right, "the interrogation must cease until an attorney is present"); see also *Edwards*, 451 U.S. at 484 ("[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights"); *Cheely*, 36 F.3d at 1448 ("Cheely's continued response to questions from Porter and Hertle after invoking his right to counsel does not constitute waiver of the right").

It is clear from the agents' declarations that Turner made both numerous phone calls attempting to contact an attorney and numerous statements that he was willing to talk with the agents without an attorney present.   The exact chronological relationship between these attempts, statements and the agents' questions is unclear from the agents' declarations.  The clearest evidence is Bauchman's testimony at the hearing.  He stated:

Q.  Now, also in your declaration, you state during the course of the interview, Turner made several phone calls to people asking them to try to call a specific lawyer?

A.  Yes. . . .

Q.  And when you say during the course of the interview, was that at the beginning, middle, end?

A.  That was throughout the interview he was constantly making phone calls.

Q.  And when he made that statement, when Turner made several phone calls to people asking for them to try to call a specific lawyer, did you take that to mean that Mr. Turner wanted lawyer?

A.  I took that to mean that he was trying to get in contact with an attorney, yes.

Q.  Did you stop the interview to locate that specific lawyer that Mr. Turner was looking for?

A.  Yes, the interview stopped and started several times.

Q.  Did you stop the interview until Mr. Turner could locate that lawyer?

A.  No, he would make a couple of – make his phone calls and then – well, to explain it fully, he had to make a phone call, and then he maybe had to like leave a message

19

because somebody didn't answer the phone.  So we had to wait and see if somebody

would call back and respond to the message, and then he would call back.  So it was

constant change, constant things going on throughout the interview.

Q.  And when he wasn't successful in reaching his lawyer during the course of the

interrogation, you kept asking questions; correct?

A.  Yes.

THE COURT:  So if he called and left a message, as you just testified –

THE WITNESS:  Yes.

THE COURT:   – and he hangs up the phone, he closes up the cell phone, however it

was, then you asked him a question right after that?

THE WITNESS: Yeah, we would continue the conversation.  It was ongoing.  But

I'll add that he would say, 'Now I'll talk to you guys.  I don't mind talking to you.'"

As can be seen, Bauchman stated that the agents continued to question Turner immediately after he

completed a telephone call trying to reach the lawyer.  When the agents resumed questioning, Turner

consented.  Once Turner had invoked his right to counsel by attempting to contact counsel, however,

*Edwards* required that the agents cease questioning him immediately and not resume unless Turner

reopened the discussion on his own initiative.  See *Smith*, 469 U.S. at 95 (citing *Edwards*, 451 U.S.,

at 485, 486  n. 9).  Because the agents did not stop questioning after Turner invoked his right to

counsel, the fact that he agreed to continue when they resumed the interrogation cannot constitute

a waiver of the right to counsel, even if he agreed immediately after they asked a question.[94]

*Edwards*, 451 U.S. at 484); *Cheely*, 36 F.3d at 1448

        With this background in mind, the court now reviews the various "sets" of statements

identified by the government.

### 4.        First and Second Set of Statements

        Turner made the first set of statements before the telephone call in which he discussed

---

[94]Although Turner signed the waiver form provided by the agents, he had the right to reinvoke
his right to counsel at any time after signing it; indeed, as the form itself indicated to him.  (Papuyo
Decl., Exh.1.)

contacting a lawyer with his wife.[95]  The second set of statements occurred after this call.[96]  Following the call, Turner told agents that his wife wanted him to speak with a lawyer before talking further with them, but that he was nonetheless willing to continue speaking with them.[97]  Turner's conversation with his wife was not his first effort to reach an attorney, however.  Once Turner invoked his right to counsel by interrupting the interview to contact a lawyer in the agents' presence, the agents were required to cease questioning until Turner reopened the discussion on his own initiative. See *Smith*, 469 U.S. at 95 (citing *Edwards*, 451 U.S., at 485, 486 n. 9). Because Turner tried to reach a lawyer before he spoke with his wife, the government's selection of the call with Fleming as a dividing line is not dispositive in assessing whether statements were obtained in violation of *Miranda*.  The agents continued to question Turner following his first attempt to reach an attorney and before he had an opportunity to reinitiate discussion on his  own.  Because questioning during the initial hour and a half interview was continuous,[98] Turner was never given an opportunity voluntarily to reinitiate discussion.  As a consequence, neither the statement used by the government as a dividing line nor other statements by Turner that he was willing to continue answering questions can be considered a valid waiver of his right to have counsel present.  Turner made calls to people regarding a lawyer "constant[ly]."[99]  Because Turner tried to contact an attorney before any of the statements in either the first or second "set" was made, and because the agents did not cease questioning him until he voluntarily and affirmatively reinitiated discussion, the statements in both sets must be suppressed.[100]

---

[95]Opp. at 4-5

[96]*Id.*

[97]*Id.*

[98]See Transcript at 54:21-55:21.

[99]*Id.* at 55:6.

[100]On October 23, 2008, the government filed a supplement to its opposition, seeking to secure admission of a further statement by Turner not referenced earlier.  (Government's Supplement to Opposition to Defendant's Motion to Suppress ("Supp. Opp.").)  The government asserts that this statement is part of the first set of statements.  (*Id.* at 2.) Consequently, the court declines to admit the

### 5.   Third Set of Statements

Turner made the third set of statements while driving with the agents, either before or after the initial interrogation.[101]  During this period, he allegedly asked the agents questions as to whether he would have eluded them had he acted differently.[102]  Regardless of when Turner made these statements, he made them spontaneously and not in response to questioning by the agents.  The third set of statements is thus not subject to the requirements of *Miranda*.  See *United States v. Sherwood*, 98 F.3d 402, 409 (9th Cir. 1996) ("'Spontaneous' or 'volunteered' confessions of a suspect in custody are admissible despite the absence of a prior Miranda warning"); *United States v. Booth*, 669 F.2d 1231, 1237 (9th Cir. 1981) ("[T]he 'spontaneous' or 'volunteered' confession of a suspect in custody is admissible despite the absence of prior Miranda warnings").  Accordingly, the court concludes that the third set of statements is admissible.

### 6.   Fourth Set of Statements

Turner unambiguously invoked his *Miranda* rights when he tried to call a lawyer at the beginning of the initial interrogation.  After that interrogation ended, the agents began to drive Turner to his initial appearance.  During this drive, Turner expressed a desire to resume questioning, and the agents returned to the FBI office to continue the interrogation.[103]  Unlike Turner's prior expressions of willingness to talk to the agents, which he offered after the agents continued to question him despite his invocation of his right to counsel, Turner made this statement on his own initiative after questioning had ceased.  There is no evidence that Turner made further attempts to contact an attorney during the second interrogation.  Therefore, the fourth set of statements is admissible.  See *Bradshaw*, 462 U.S. at 1045-46.

---

statement.

[101]May Decl., ¶ 7.

[102]*Id.*

[103]Papuyo Decl., ¶ 14.

22

### III. CONCLUSION

For the foregoing reasons, the court grants in part and denies in part defendant's motion to suppress the oral statements he made to law enforcement agents on June 13, 2007. Any statements made by Turner during the initial interrogation session will be suppressed. The spontaneous statements made by Turner while in the car with agents, and any statements made during the second interrogation session will be admitted.

DATED: October 27, 2008

_____

MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE